JONES, Justice.
Barclay International (“Barclay”)[1] appeals from a partial summary judgment, made final pursuant to Rule 54(b), A.R. Civ.P. The dispute between the parties is over their rights and duties under various agreements entered into by them, pursuant to a complex loan arrangement. Because the agreements are ambiguous and questions of fact exist, we reverse.

Part I

Facts

In July 1980, Barclay approached First Alabama Bank (“Bancshares”) with a request for a $2,000,000 loan to finance the purchase and construction of a manufacturing plant. This financing was to be handled as a long-term loan, with the Industrial Development Board of Bay Minette (“the IDB”)[2] issuing industrial development bonds, and with First Alabama Bank of Montgomery (“FABM”) acting as trustee for these bonds. Under this arrangement, the IDB acquired the necessary land and facilities and leased them to Barclay. The requisite funds were borrowed from FABM, and a bond in this amount was issued to FABM, along with a mortgage on the property and facilities used by Barclay.
Joseph H. Dzwonkowski was one of the principals of Barclay and was also the on-site manager. The other principals were European investors, McTavish Thompson-Moore and Colijn Thompson-Moore (“the Thompson-Moores”), none of whom took an active role in the management of the company.[3]
Initially, the Thompson-Moores wanted to capitalize Barclay with $500,000 in cash. After reviewing this proposal, Bancshares decided that it would need more collateral to make the requested loan. The Thompson-Moores did not want to put in any more cash and, eventually, a compromise was reached, whereby the Thompson-Moores agreed to have a letter of credit issued in the amount of $750,000 from the Hong Kong and Shanghai Banking Corporation (“H & S”), which, under certain specified conditions, could be drawn on by FABM.
The letter of credit was issued by H & S and received by First Alabama Bank of Mobile County, an affiliate of Bancshares (later changed to Merchants National Bank (“Merchants”)),[4] about six weeks before the closing of the bond issue. At the closing, a $2,000,000 bond was issued in favor of FABM by the IDB. The other documents involved in this case were executed at this closing and included: 1) a lease agreement whereby Barclay agreed to lease the land and facilities acquired through the bond proceeds from the IDB; 2) a mortgage and indenture of trust (“the Trust Indenture”) conveying the land and facilities, as well as any rights under the lease agreement, from the IDB to FABM; and 3) a bond guaranty agreement (“the Guaranty Agreement”), whereby repayment of the bond was guaranteed by Barclay and Dzwonkowski and his wife.
Under the terms of the bond, Barclay was obligated to FABM to make semi-annual interest payments in January and July *1203 and annual principal payments in January. These payments were to be taken out of the Barclay Bond Fund (“the Bond Fund”), a fund set up under the Trust Indenture into which all monthly lease payments made by Barclay, and any other revenues received by FABM, were to be deposited. Furthermore, pursuant to the Trust Indenture, a “debt service reserve fund” was created, whereby the sum of at least $180,-000 was to be maintained to service the debt in the event the “bond fund” was insufficient to pay any past-due installment.
Barclay began operation in 1981 and almost immediately began to suffer economic difficulties. Notwithstanding these economic troubles, Barclay made several interest and principal payments on time; but despite substantial additional capital input from the passive investors, Barclay was unable to make its monthly lease payments into the Bond Fund in 1982.
After Barclay fell behind on its lease payments, a representative of FABM contacted H & S and informed it that FABM would accept $288,000 from the investors in Barclay in lieu of calling on the letter of credit. This amount would cure all arrear-ages, replenish the reserve fund, and pay off a $61,000 working capital loan made by Merchants. This amount was not forthcoming and, on December 7, 1982, FABM sent written notice to H & S that Barclay was in default and also sent a sight draft for $750,000 payable to Merchants. On December 27, 1982, the $750,000 was received by Merchants and credited to the account of FABM.
Of the $750,000 received by FABM, $283,000 was used to pay off the amounts then due. The remaining sums were applied, in inverse order, to extinguish the most distantly maturing installments due under the bond. At the time these events occurred, FABM had not sent a notice of default on the bond to either Barclay or the IDB, and no acceleration of the payments due under the terms of the bond had been declared.[5]
Upon acceleration of the bond payments, Barclay filed a declaratory judgment action and, in count seven of the complaint (upon which judgment was entered), sought a judicial declaration that the letter-of-credit funds were improperly applied and that Barclay was not in default under the trust indenture or lease agreement. Barclay’s claim is grounded on its contention that the excess letter-of-credit funds should have been applied to the debt in accordance with § 7.7 of the trust indenture, while FABM’s defense hinges essentially on the proposition that its rights with respect to the letter of credit are independent of the trust indenture. Both parties filed motions for partial summary judgment.[6] The trial court granted FABM’s motion, holding that the letter-of-credit funds were not misapplied and that Barclay was currently in default under the lease and trust agreement. Barclay appeals.
Part II

Contentions of the Parties

Barclay contends- that the excess funds from the letter of credit, over the $283,000 then due, should have been placed in the bond fund pursuant to § 7.7(a) of the trust indenture to pay the next maturing installments under the bond. Section 7.7 provides:
“Section 7.7 Application of Money Collected. Any money collected by the Trustee pursuant to this Article or pursuant to any right given to it or action taken by it' under the provisions of this Article, together with all other funds of *1204 the Borrower then held by it or the Trustee hereunder, shall, after payment of all amounts for which the Trustee has a lien under Section 8.7 hereof, be applied in the following order:
“(a) Unless the entire principal balance of the Bond shall have been declared due and payable, all such moneys shall be applied:
“First. To the payment of interest then due on the Bond, with interest on overdue installments of such interest.
“Second. To the payment of the unpaid principal of the Bond which shall have matured, with interest on overdue installments of principal from the respective dates upon which they became due.
“Third. The surplus, if any, to the Bond Fund.
“(b) If the entire principal balance of the Bond shall have become or been declared due and payable, all such moneys shall be applied as follows:
“First. To the payment of the principal and interest then due and unpaid upon the Bond, with interest on overdue principal and interest.
“Second. The surplus, if any, to the Borrower or to whomsoever may be entitled thereto.”
Barclay contends that subparagraph (b) is inapplicable, because, at the time the letter of credit was called, the entire balance of the bond had not become, nor been declared, due and payable by FABM. Barclay, therefore, argues that, because the entire amount of the bond had not been declared due, § 7.7(a) is controlling in regard to the application of the excess letter-of-credit funds. In further support for this argument, Barclay points to § 7.4 of the trust indenture, which gives the trustee certain rights and remedies in the event of a default under the lease. Section 7.4, in pertinent part, provides:
“Rights and Remedies of Trustee on Default under Lease. The Trustee shall have the right in the name of the Borrower to declare any default and exercise any remedy or remedies under the Lease Agreement or any other lease of the Project, including the right to declare the entire rent reserved under such lease immediately due and payable and to take any available proceedings against any party liable upon any such lease for the payment thereof, including any guarantor, if any, of the Lessee’s obligations.”
The remedies under the lease are set forth in § 8.2 of that document, which, in pertinent part, provides:
“Whenever any such event of default shall have happened and be continuing, the Lessor or the Trustee may take any of the following remedial steps:
[[Image here]]
“(d) Take whatever legal proceedings may appear necessary or desirable to collect the rent then due, whether by declaration or otherwise, or to enforce any obligation or covenant or agreement of the Lessee under this Lease Agreement or by law.”
Pursuant to § 7.5(d) of the lease, Barclay was required to secure a $750,000 credit guaranty running in favor of the trustee for the benefit of the bondholder. Thus, Barclay argues that the enforcement of § 7.5(d) of the lease, as well as the letter of credit itself, is one of the remedies provided under the lease, which the trustee may exercise under § 7.4 of the trust indenture. Therefore, contends Barclay, the letter-of-credit funds were collected by the trustee pursuant to Article VII of the trust indenture, thus triggering the application of § 7.7(a) of that document.
FABM contends, on the other hand, that Article VII of the trust indenture does not apply to the proceeds from the letter of credit, because the lease was executed between Barclay and the IDB and was subsequently assigned to FABM. FABM argues, therefore, that § 7.4 of the trust indenture can refer only to remedies of the borrower, IDB, under the lease, and not to remedies of the trustee.[7]
*1205 However, counters Barclay, § 7.4 further provides that the trustee “shall pursue such proper remedies as may be directed by the holder of the bond for the enforcement of the provisions of such lease and guaranty, if any, and the exercise of any remedies available to the Borrower or the Trustee in the event of such default under such lease.” (Emphasis added.) Barclay further argues that FABM’s narrow construction of § 7.7 of the trust indenture is unreasonable in light of the fact that there are no other provisions governing the application of excess funds from the letter of credit.

Part III

Propriety of Summary Judgment

Summary judgment is appropriate only in those cases where there is no .genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56, A.R.Civ.P. Where the terms of the contract are unambiguous and the meaning of the contract can be determined as a matter of law, summary judgment is appropriate. Brock v. Old Southern Life Ins. Co., 531 So.2d 867 (Ala.1988). However, if there is any ambiguity in the provisions of the contract, which may be resolved by the use of parol evidence, summary judgment cannot properly be entered. J. Paul Jones Hospital v. Jackson, Coker & Associates, Inc., 491 So.2d 972 (Ala.Civ.App.1986).
In reviewing a summary judgment, this Court will view the evidence in the light most favorable to the nonmoving party. Hightower & Co. v. United States Fidelity & Guaranty Co., 527 So.2d 698 (Ala.1988). Applying this standard to the full context of this case, we find that there are ambiguities in the agreements entered into by FABM and Barclay (or for Barclay’s benefit); therefore, summary judgment was improperly granted.
Initially, we note that a genuine question of material fact is presented with regard to what moneys were required to be deposited in the Bond Fund, where no acceleration of the entire principal amount due under the bond had been declared. Furthermore, the provisions of § 7.7 not only provide for the “application of money collected,” but also contain the only pertinent reference to the sources of sums to be applied. This amgi-buity, standing alone, is sufficient to warrant reversal of the summary judgment entered in favor of FABM. Because the language used in § 7.7 is ambiguous regarding the letter of credit (any specific reference thereto being conspicuously omitted), and, in the absence of any other provision in the agreements that deal with the application of these funds, we find that the issues regarding the disposition of the letter-of-credit funds present a factual question that cannot be disposed of by summary judgment.
Because we hold that questions of material fact exist and that the documents do not unambiguously support FABM’s position, we pretermit addressing the parties’ other arguments regarding the application of the excess funds.
Barclay contends that FABM had no right to call the entire amount of the letter of credit when only $283,000 was then due and payable.[8] The letter of credit, in pertinent part, provides:
“We confirm that, with effect from 14 November 1980, we issued the following guarantee letter of credit to yourselves through our New York Office, confirmed by Morgan Guaranty New York.
“TO FIRST ALABAMA BANK OF MOBILE COUNTY. GUARANTEE NO JER 800004 IN CONSIDERATION OF FIRST ALABAMA BANC- *1206 SHARES MAKING AVAILABLE BOND FINANCE OF US $2,000,-000.00 (TWO MILLION UNITED STATES DOLLARS) TO BARCLAY INTERNATIONAL, WE, THE HONG-KONG AND.SHANGHAI BANKING CORPORATION (Cl) LIMITED, (HEREINAFTER REFERRED TO AS ‘THE GUARANTOR’) hereby guarantee that we will pay you any sum due to you up to a maximum of us $750,-000.00 (SEVEN HUNDRED AND FIFTY THOUSAND UNITED STATES DOLLARS) UPON PRESENTATION TO THE GUARANTOR OF THE FOLLOWING DOCUMENTS:
“1) DRAFT DRAWN AT SIGHT ON THE GUARANTOR INDICATING THE ABOVE GUARANTEE NUMBER.
“2) NOTIFICATION FROM FIRST ALABAMA BANK OF MOBILE COUNTY THAT BARCLAY INTERNATIONAL BAY MINETTE, ALABAMA IS IN DEFAULT.”
Barclay argues that the language of the letter of credit restricted FABM to collecting only the amount then due, which was $283,000. The bond, at the time the letter of credit was called, had not been accelerated, nor had Barclay received any notice of default. Furthermore, a representative of Merchants, who was acting on behalf of the trustee, FABM, testified:
“Q And the instructions you received as Trustee — the instructions you had from the Trustee was to act as their agent to make the required draw on the above referenced Letter of Credit to meet the debt service requirements due December 1 of '82. Am I correct?
“A Yes, sir.
“Q You were not authorized to receive any additional money other than what was required to meet the debt service under that authority by the Trustee, were you?
“A Based on that letter, that’s correct.”
Clearly, a question of fact exists with regard to the amount properly drawn under the letter of credit. The letter is not unambiguous in this regard.
FABM contends that 1) the “independent doctrine” regarding letters of credit as set forth in Citronelle Unit Operators Committee v. AmSouth Bank, N.A., 536 So.2d 1387 (Ala.1988), and Benetton Services Corp. v. Benedot, Inc., 551 So.2d 295 (Ala.1989), prohibits Barclay from raising the issue; and 2) Barclay lacks standing. Although letters of credit are deemed independent of the underlying contract as between the issuer and the beneficiary, we do not believe that this principle is controlling in the instant case. The issue in Citro-nelle Unit was whether the issuer of a letter of credit had a duty to investigate beyond the documents required to be presented, pursuant to the letter of credit, to ascertain if, in fact, a breach of the underlying contract had occurred before the issuer paid the letter of credit. This is not the issue presented here, for the issuer, H & S, is not a party to this action. Rather, the issue in this case is whether payment under the letter of credit was properly demanded and applied by the beneficiary. This issue is controlled by Code 1975, § 7-5-111, which deals with warranties by the beneficiary that payment under a letter of credit was properly due. Therefore, we hold that Citronelle Unit and its progeny are not controlling in this case.
In regard to FABM’s contention that Barclay, Dzwonkowski, and his wife lack standing to challenge the payment of the letter of credit, because they were not parties to the letter of credit, we disagree, and hold that, under the facts of this case, they are interested parties within the meaning of § 7-5-111. See, also, Rule 19, A.R. Civ.P. The letter of credit was procured by the Thompson-Moores, who were the principals of Sylvanus Hautptotukten, a Dutch corporation, which owned 50% of Barclay. The letter of credit was executed solely for the benefit of Barclay to enable it to obtain the necessary financing to capitalize the company. This cannot be disputed when viewing all of the agreements in their totality. Now that the funds from the letter of credit have been depleted, Barclay has been left with no collateral to obtain additional financing.
*1207 Furthermore, Dzwonkowski and his wife personally guaranteed repayment of the bond, to secure which the letter of credit was issued, and they are now subject to liability for the balance due. The propriety of calling the entire amount of the letter of credit, as well as the application of its proceeds, are plainly issues that substantially affect the future financial viability of Barclay and the Dzwonkowskis. Therefore, under the facts of this case, they are interested parties and have standing to challenge the draw under the letter of credit.
Finally, FABM contends that Barclay is merely an incidental beneficiary of the letter of credit, and, for this reason, lacks standing to challenge the draw thereunder. Again, we disagree. The test applied in determining if a third party can recover under a contract is whether the parties intended to confer a direct benefit to the third party. Anderson v. Howard Hall Co., 278 Ala. 491, 179 So.2d 71 (1965). To determine the intention of the parties, one must examine the contract and the surrounding circumstances. Mutual Benefit Health & Accident Ass’n v. Bullard, 270 Ala. 558, 120 So.2d 714 (1960). Although the letter of credit itself does not, in specific terms, refer to Barclay, the other agreements and the surrounding circumstances in this ease support Barclay’s argument that it was an intended third-party beneficiary of the letter of credit. As previously stated, the sole purpose of the letter of credit was to secure Barclay’s loan, for without it the loan would not have been made.
Moreover, considering the totality of these circumstances, it appears that, except for the payee, Barclay and the Dzwonkow-skis, individually, are the only real parties in interest. FABM accepted the letter of credit in lieu of any further capitalization of Barclay. The letter of credit was shown on Barclay’s financial statements as contingent capital until it was called on, at which time it was treated as additional paid-in capital. Dzwonkowski, the Thompson-Moores, and a Joe Weiner owned Sylvanus Hautptotukten. The Thompson-Moores, who executed the letter of credit, were essentially principals in Barclay. They received a 50% interest in the company in exchange for contributing the $500,000; and, upon the request of FABM for additional security, they also executed the $750,000 letter of credit. The letter of credit represented funds furnished by the principals of Barclay; thus the $750,000 was capital of Barclay and not funds of a third party.
We hold, therefore, that the summary judgment in favor of FABM is due to be reversed. The cause is remanded for a trial on the issues in accordance with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES and ADAMS, JJ., concur.
STEAGALL, J., dissents.

. Joseph H. and Patricia Ann Dzwonkowski were also plaintiffs in this case and join in the appeal. All are collectively referred to as "Barclay.”

. The IDB was named as a defendant, as required by Rule 19, A.R.Civ.P. No affirmative relief has been sought against it, and on appeal its interests are aligned with those of Barclay.

. The sole stockholder of Barclay other than Dzwonkowski was a Dutch corporation called Sylvanus Hautptotukten. This corporation was controlled by the Thompson-Moores.

. The letter of credit was made payable to First Alabama Bank of Mobile, the originator of the loan, at the request of FABM. In all, four affiliates of Bancshares, including FABM, participated in the bond transaction.

. In fact, it is not apparent from the record whether Barclay was actually in default under the bond at this time. FABM did not send out notice of default and acceleration of the principal balance of the Bond until January 11, 1984.

. For the sake of clarity, we note that FABM’s motion for partial summary judgment (which was granted) specifically addressed only Count Seven, while Barclay’s motion (which was denied) specifically addressed Counts One, Two, Seven, Eight, Nine, Eleven, Twelve, Thirteen, and Fourteen. Although the trial court denominated its order as a “partial summary judgment" in favor of FABM, the judgment entered effectively adjudicated the entire controversy adversely to Barclay.

. In addition to its response to Barclay’s arguments for reversal, FABM, in support of the judgment, contends that Barclay, as a mere incidental beneficiary, lacks standing to challenge FABM’s exercise of its "rights” under the letter *1205 of credit. This contention is more fully set out and addressed under Part III of the opinion.

. Although this precise issue is not the gravamen of Count Seven of Barclay’s complaint, upon which summary judgment was entered, we address the issue for two reasons: 1) the trial court impliedly held that FABM’s draw of the entire amount of the letter of credit was proper; and 2) to address the threshold issue whether Barclay, Dzwonkowski, and his wife, who personally guaranteed the repayment of the bond, have standing to challenge FABM’s authority to draw and disburse the face value of the letter of credit.